1   KARL OLSON (SBN 104760)
    AARON R. FIELD (SBN 310648)
2   IRENE LEE (SBN 331485)
    CANNATA O'TOOLE FICKES & OLSON LLP
3   100 Pine Street, Suite 350
    San Francisco, California 94111
4   Telephone:    (415) 409-8900
    Facsimile:    (415) 409-8904
5   Email:        kolson@cofolaw.com
                  afield@cofolaw.com
6                 ilee@cofolaw.com

7   Attorneys for Plaintiff,
    AMERICAN SMALL BUSINESS LEAGUE

8

9

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13

14   AMERICAN SMALL BUSINESS            Case No. 3:20-cv-04619-MMC
     LEAGUE,
15                                      **PLAINTIFF AMERICAN SMALL BUSINESS
                 Plaintiff,             LEAGUE'S NOTICE OF MOTION AND
16                                      MOTION FOR SUMMARY JUDGMENT;
         vs.                            MEMORANDUM OF POINTS AND
17                                      AUTHORITIES**
     UNITED STATES SMALL BUSINESS
18   ADMINISTRATION,                    Date:      October 9, 2020
                                        Time:      9:00 a.m.
19               Defendant.             Judge:     Hon. Maxine M. Chesney
                                        Dep't:     Courtroom 7, 19th Floor
20

21

22

23

24

25

26

27

28

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

1

CANNATA, O'TOOLE, FICKES & OLSON LLP
ATTORNEYS AT LAW
100 PINE STREET, SUITE 350, SAN FRANCISCO CA. 94111
TEL.: 415.409.8900 – FAX: 415.409.8904

## TABLE OF CONTENTS

NOTICE OF MOTION ......................................................................................... 1

RELIEF SOUGHT            ......................................................................................... 1

ISSUES TO BE DECIDED ................................................................................... 2

I.      INTRODUCTION ...................................................................................... 2

II.     FACTS AND PROCEDURAL HISTORY ................................................. 3

        A.      THE AMERICAN SMALL BUSINESS LEAGUE ................................. 3

        B.      THE UNITED STATES SMALL BUSINESS ADMINISTRATION ........ 3

                1. The SBA Is Supposed to Promote and Protect Small Businesses and the
                   Nation's Economy ...................................................................... 3

                2. The SBA Has Administered Small Business Loan Guaranty Programs for
                   Decades. ..................................................................................... 4

                3. The SBA Has Long Collected And Published Detailed Particularized Loan-
                   Level Information (The Kind It's Now Trying To Hide) About Loans Under
                   Its Small Business Loan Guaranty Programs ............................ 5

        C.      THE CORONAVIRUS AID, RELIEF, AND ECONOMIC SECURITY ("CARES")
                ACT ............................................................................................ 6

        D.      THE PPP'S PARTICULAR PROGRAMMATIC PROBLEMS .......................... 12

        E.      ASBL'S FOIA REQUEST NO. SBA-2020-000566 AND THIS LAWSUIT ............... 14

III.    ARGUMENT ............................................................................................ 16

        A.      BURDEN ON GOVERNMENT TO JUSTIFY NON-DISCLOSURE .................. 16

        B.      DEFENDANT HAS CONSTRUCTIVELY DENIED FOIA REQUEST NO. SBA-2020-
                000566, AS AMENDED, INCLUDING THE PORTION OF THAT REQUEST THAT SEEKS
                THE PPP INFORMATION SOUGHT IN THIS MOTION ............................. 17

        C.      DEFENDANT HAS IMPROPERLY DENIED FOIA REQUEST SBA-2020-000566,
                AS AMENDED .............................................................................. 18

                1. Defendant Is Withholding Responsive Records. ....................... 18

                2. Defendant Cannot Justify Failing To Disclose The Same Information About

i

PPP(A) Loans That It Has Always Disclosed About Non-PPP 7(A) Loans, And That It Specifically Told Borrowers It Would Disclose "Automatically" ........................................................................................ 19

i. Exemption 4 Does Not Apply ..................................................... 19

ii. Exemption 6 Does Not Apply ..................................................... 22

IV.     CONCLUSION ........................................................................................ 25

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

ii

# TABLE OF AUTHORITIES

## <u>CASES</u>

*A.C.L.U. v. U.S. Dep't of Justice,*
  880 F.3d 473, (9th Cir. 2018).................................................................. 16

*Alaska Urological Institute, P.C. v. U.S. Small Bus. Admin.,*
  2020 WL 4910291 (D. Alaska Aug. 20, 2020) ...................................... 12

*Am. Ass'n of Political Consultants v. U.S. Small Bus. Admin.,*
  __ F. Supp. 3d __ 2020 WL 1935525 (D.D.C. Apr. 21, 2020)........................ 6, 10

*Animal Legal Defense Fund v. U.S. Food & Drug Admin.,*
  836 F.3d 987 (9th Cir. 2016)................................................................. 17

*Bloomberg L.P. v. Bd. of Governors of the Federal Reserve System,*
  601 F.3d 143 (2d Cir. 2010)................................................................... 22

*Center for Investigative Reporting v. U.S. Customs & Border Prot'n,*
  436 F. Supp. 3d 90 (D.D.C. 2019) ......................................................... 22

*Cf. Buffalo Evening News, Inc. v. U.S. Small Bus. Admin.,*
  666 F. Supp. 467 (W.D.N.Y. 1987) ....................................................... 20

*Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n ("CREW"),*
  711 F.3d 180 (D.C. Cir. 2013) .............................................................. 18

*Dep't of Air Force v. Rose,*
  425 U.S. 352 (1976).............................................................................. 16

*DV Diamond Club of Flint, LLC v. U.S. Small Bus. Admin.,*
  __ F. Supp. 3d __, 2020 WL 2315880 (E.D. Mich. May 11, 2020) ................ 6,8

*Ecological Rights Found. v. F.E.M.A.,*
  2017 WL 5972702 (N.D. Cal. Nov. 30, 2017).......................................... 18

*Elec. Frontier Found. v. Office of the Dir. of Nat. Intelligence,*
  639 F.3d 876 (9th Cir. 2010)................................................................. 24

*EPA v. Mink,*
  410 U.S. 73 (1973)................................................................................ 16

*Food Mktg. Inst. v. Argus Leader Media,*
  139 S. Ct. 2365 (2019)....................................................................19-20, 22

*Goldwater Institute v. U.S. Dep't of Health and Human Services,*
  2020 WL 1487844 (9th Cir. March 24, 2020) ......................................... 19

*John Doe Agency v. John Doe Corp.,*
  493 U.S. 146 (1989).............................................................................. 16

*Jurewicz v. U.S. Dep't of Agric.,*
  741 F.3d 1326 (D.C. Cir. 2014) ............................................................ 23

*Multi AG Media v. Dep't of Agriculture,*
  515 F.3d 1224 (D.C. Cir. 2008) ............................................................ 23

*Nat'l Ass'n of Home Builders v. Norton,*
  309 F.3d 26 (D.C. Cir. 2002) ................................................................ 23

*News–Press v. U.S. Dep't of Homeland Sec.,*
  489 F.3d 1173 (11th Cir.2007).............................................................. 25

CANNATA, O'TOOLE, FICKES & OLSON LLP
ATTORNEYS AT LAW
100 PINE STREET, SUITE 350, SAN FRANCISCO CA. 94111
TEL: 415.409.8900 – FAX: 415.409.8904

*Pac. Architects and Engineers v. U.S. Dep't of State*,
  906 F.2d 1345 (9th Cir. 1990)...................................................................21

*Pac. Fisheries Inc. v. United States*,
  539 F.3d 1143 (9th Cir. 2008)...................................................................16

*Painting Indus. of Hawaii Mkt. Recovery Fund v. U.S. Dep't of Air Force*,
  26 F.3d 1479 (9th Cir. 1994)....................................................................23

*Rosenberg v. DOD*,
  2018 WL 4637363 (D.D.C. Sept. 27, 2018)  ...........................................17

*Tradeways, Ltd. v. United States Dep't of the Treasury*,
  2020 WL 3447767 (D. Md. June 24, 2020) ............................................6-7

*U.S. Dep't of Defense v. Federal Labor Relations Board*,
  510 U.S. 487 (1994)............................................................................23,25

*U.S. Dep't of State v. Ray*,
  502 U.S. 164 (1991)..................................................................................23

*U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*,
  489 U.S. 749 (1989)..................................................................................23

*United States v. Suarez*,
  880 F.2d 626 (2d Cir.1989).......................................................................25

## STATUTES AND REGULATIONSN

13 C.F.R. § 120.100 ......................................................................................4

13 C.F.R. § 120.100(a)..................................................................................4

13 C.F.R. § 120.100(b)..................................................................................4

13 C.F.R. § 120.100(c)..................................................................................4

13 C.F.R. § 120.100(d)..................................................................................4

13 C.F.R. § 120.100(e)..................................................................................6

13 C.F.R. § 120.101 ......................................................................................6

13 C.F.R. § 120.110 ......................................................................................4

13 C.F.R. § 120.212 ......................................................................................5

13 C.F.R. § 120.213 ......................................................................................5

13 C.F.R. § 120.214 ......................................................................................5

13 C.F.R. § 120.120 ......................................................................................5

15 U.S.C. § 631(a). ......................................................................................4

15 U.S.C. § 633(a) ........................................................................................4

15 U.S.C. § 633(b)(3)(A) ..............................................................................6

15 U.S.C. § 633(b)(3)(B) ............................................................................18

15 U.S.C. § 636(a) ..................................................................................4, 12

15 U.S.C. § 636(a)(36) ..................................................................................9

15 U.S.C. § 636(a)(36)(B).............................................................................9

CANNATA, O'TOOLE, FICKES & OLSON LLP
ATTORNEYS AT LAW
100 PINE STREET, SUITE 350, SAN FRANCISCO CA. 94111
TEL: 415.409.8900 – FAX: 415.409.8904

15 U.S.C. § 636(a)(36)(A)(viii) ................................................................. 10

15 U.S.C. § 636(a)(36)(A)(viii)(I)(bb) ..................................................... 10

15 U.S.C. § 636(a)(36)(A)(viii)(II)(aa) .................................................... 10

15 U.S.C. § 636(a)(36)(B) ........................................................................ 12

15 U.S.C. § 636(a)(36)(D)(i)(I) ................................................................ 10

15 U.S.C. § 636(a)(36)(D)(i)(II) ............................................................... 10

15 U.S.C. § 636(a)(36)(E) ........................................................................ 10

15 U.S.C. § 636(a)(36)(H)-(J) .................................................................. 10

15 U.S.C. § 639(a) ................................................................................. 6,18

15 U.S.C. § 632 ..................................................................................... 4, 10

5 U.S.C. § 552(a)-(b) ............................................................................ 16,17

5 U.S.C. § 552(a)(6)(A)(i) ........................................................................ 18

5 U.S.C. § 552(a)(8)(A) ........................................................................ 17,22

5 U.S.C. § 552(a)(8)(A)(i) ........................................................................ 17

5 U.S.C. § 552(b) ...................................................................................... 17

5 U.S.C. § 552(b)(4) ................................................................................. 19

*Maximum Allowable 7(a) Fixed Interest Rates*,
    83 F.R. 55478 (Nov. 6, 2018) .............................................................. 5

*Business Loan Program Temporary Changes; Paycheck Protection Plan*,
    85 F.R. 20,811 (Apr. 15, 2020) .......................................................... 12

Fed. R. Civ. P. 56(a) ................................................................................. 17

H.R. 6800 .................................................................................................. 11

S. 4321 ...................................................................................................... 11

Small Business Act of 1953, Pub. L. 83-163, Title II, § 201 ...................... 3

CANNATA, O'TOOLE, FICKES & OLSON LLP
ATTORNEYS AT LAW
100 PINE STREET, SUITE 350, SAN FRANCISCO CA, 94111
TEL: 415.409.8900 – FAX: 415.409.8904

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

### NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on Friday, October 9, 2020, at 9:00 a.m., in Courtroom 7, 19th Floor of the United States District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Ave., San Francisco, CA 94102, before the Honorable Maxine M. Chesney, plaintiff American Small Business League ("plaintiff" or "ASBL") will and hereby does move, pursuant to Federal Rule of Civil Procedure[1] 56, for an Order granting summary judgment in its favor and against defendant United States Small Business Administration ("defendant" or "SBA"), requiring defendant to disclose all records that it has requested under the Freedom of Information Act, 5 U.S.C. section 552 ("FOIA"), to plaintiff.

This Motion is made on the grounds that no material facts are in dispute and ASBL is entitled to judgment as a matter of law.

This Motion is based on this Notice of Motion; plaintiff's Memorandum of Points and Authorities and anticipated Reply in support; the declarations of Karl Olson, Mark Olson, and Lloyd Chapman filed herewith; the Request for Judicial Notice filed herewith; the Court's records and files in this action; and any other evidence and argument the Court receives before or at the hearing on this Motion.

### RELIEF SOUGHT

ASBL seeks an order granting summary judgment for it and against defendant under Rule 56 and mandating immediate disclosure of one sub-category of information at issue for which disclosure is obviously required and urgently needed:  the same information about each and every loan approved by the SBA as part of the $650 billion Paycheck Protection Program ("PPP") that the SBA publishes on its website about other loans made pursuant 15 U.S.C. section 636(a) (including whether and the extent to which each borrower's PPP loan was forgiven, which is analogous to the "GrossChargeOffAmount" data the SBA publishes about 7(a) loans).

---

[1] All references to Rules in this motion are to the Federal Rules of Civil Procedure unless otherwise stated.

1

1

**ISSUES TO BE DECIDED**

2        Whether the SBA must disclose the same information about all PPP loans that it

3    publishes on its website about other loans made pursuant to 15 U.S.C. section 636(a).

4                **MEMORANDUM OF POINTS AND AUTHORITIES**

5    **I.        INTRODUCTION**

6        ASBL filed this lawsuit, and now makes this motion, in an effort to shed light on how

7    $650 billion in government money was spent earlier this year as part of the so-called Paycheck

8    Protection Program ("PPP"), in order to empower ASBL, lawmakers, and the public to evaluate

9    whether, and the extent to which, the PPP reached its intended beneficiaries, truly small

10   businesses, and protected Americans' jobs as it was meant to do. So far, the SBA has disclosed

11   only abstract information about PPP loans, leaving unanswered many questions about this

12   massive outlay of funds.

13        With respect to other loans under section 15 U.S.C. section 636(a), the section of the

14   U.S. Code into which the CARES Act inserted the PPP, however, which are commonly called

15   "7(a) loans" based on the section of the Small Business Act that first created that subdivision,

16   the SBA publishes a wealth of information about each loan on its website.  This includes the

17   name of each borrower, the amount of each loan, and the amount, if any, eventually covered by

18   the federal government, in Excel spreadsheet format. In this motion, ASBL seeks to harmonize

19   the SBA's PPP disclosures with its disclosures about other loans made under section 7(a). The

20   SBA should be ordered to disclose the same information about each and every PPP loan that it

21   publishes about other 7(a) loans on its website, to educate the public about whether the PPP

22   truly helped small businesses or rather unduly aided large businesses and was riddled with

23   fraud.

24        The SBA has not met its burden of showing, and cannot show, that its refusal to disclose

25   basic information such as borrower names and loan amounts – a departure from its prior

26   practice – is justified. Because there is no justification for treating PPP loans differently from

27   other 7(a) loans under FOIA, and because the information at issue is urgently needed to inform

28   the public debate about COVID-19 relief ahead of the November 3 election, this motion should

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

2

1   be granted.

2   **II.      FACTS AND PROCEDURAL HISTORY**

3       **A.      THE AMERICAN SMALL BUSINESS LEAGUE**

4       Plaintiff ASBL is an organization located in Petaluma, California. Declaration of Lloyd

5   Chapman in Support of Plaintiff's Motion for Summary Judgment ("Chapman Decl.") ¶ 3.

6   ASBL's core mission is to promote and advocate for the interests of small business concerns

7   through public policy change. *Id.* ASBL's efforts aim to focus the public's attention on

8   government programs intended to help *small* businesses, and on instances in which these

9   programs fail to help small businesses but rather help *large* businesses instead. *Id.* To do this,

10  ASBL reviews government policies and investigates government programs intended to help small

11  businesses to see whether they are achieving their goals and whether small businesses –  as

12  opposed to large businesses – are getting a fair share of government funds. *Id.* ASBL regularly

13  makes, analyzes, and publishes information obtained under FOIA, and has successfully

14  prosecuted many FOIA lawsuits. *Id.*

15      **B.      THE UNITED STATES SMALL BUSINESS ADMINISTRATION**

16          **1.      The SBA Is Supposed to Promote and Protect Small Businesses and the Nation's Economy.**

17      Defendant SBA is a federal agency created by the Small Business Act of 1953, Pub. L.

18  83-163, Title II, § 201 et seq. (67 Stat. 232, July 30, 1953), one of the most important laws in the

19  nation that advance the interests of small businesses. The Act begins with a "declaration of

20  policy":

21
22      The essence of the American economic system of private enterprise is free
    competition. Only through full and free competition can free markets, free entry
23  into business, and opportunities for the expression and growth of personal
    initiative and individual judgment be assured. The preservation and expansion of
24  such competition is basic not only to the economic well-being but to the security
    of this Nation. Such security and well-being cannot be realized unless the actual
25  and potential capacity of small business is encouraged and developed. It is the
    declared policy of the Congress that the Government should aid, counsel, assist,
26  and protect, insofar as is possible, the interests of small-business concerns in order
    to preserve free competitive enterprise . . .  and to maintain and strengthen the
27  overall economy of the Nation.

28

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

3

15 U.S.C. § 631(a). In 1980, the Act was amended to add 15 U.S.C. section 631a, which elaborates that the Small Business Act and the SBA's programs are also intended to "[f]oster small business" and enhance "[c]apital availability for small business." The SBA was created "[i]n order to carry out" the Small Business Act's "policies," 15 U.S.C. § 633(a).

### 2.   The SBA Has Administered Small Business Loan Guaranty Programs for Decades.

The SBA administers programs for providing financial assistance to small businesses that lack alternative access to credit pursuant to authority it has had since it was founded. "The 7(a) loan program is the SBA's primary program for providing financial assistance to small businesses." U.S. Small Bus. Admin., *Types of 7(a) loans* <available at https://www.sba.gov/partners/lenders/7a-loan-program/types-7a-loans>. Section 7(a) of the Small Business Act empowered the SBA "to make loans to any qualified small business concern" "in cooperation with banks or other financial institutions through agreements to participate on an immediate or deferred (guaranteed) basis." 15 U.S.C. § 636(a). The SBA administers its 7(a) small business loan program based on this authority. *See* Olson Decl., Ex. P (*WP Company LLC, et al. v. U.S. Small Bus. Admin.*, Case No. 1:20-CV-01240 (JEB), ECF No. 14-1 at 3 ¶ 4); *see also* Dilger, et al., *COVID-19 Relief Assistance to Small Businesses: Issues and Policy Options* (Congressional Research Service Sept. 4, 2020), 17-18, <available at https://crsreports.congress.gov/product/pdf/R/R46284>; Dilger, *Small Business Administration 7(a) Loan Guaranty Program* (Congressional Research Service Apr. 30, 2020) <available at https://crsreports.congress.gov/product/pdf/R/R41146>.

The rules governing traditional 7(a) loans are set forth not only in the United States Code, but also in SBA regulations. *See* 13 C.F.R. § 120.100, et seq. To qualify for a traditional 7(a) loan, a business must be a "small business" as defined by 15 U.S.C. section 632 and SBA regulations, including 13 C.F.R. section 121.201. 13 C.F.R. § 120.100(d). It must also be an operating business, organized for profit, that is located within the United States. 13 C.F.R. § 120.100(a)-(c); *see also* 13 C.F.R. § 120.110 (providing that certain types of businesses are ineligible for traditional 7(a) loans, including non-profit businesses, financial businesses primarily

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

1   engaged in lending, insurance companies, and others). And it must have "a need for the desired

2   credit," and show that credit is not available elsewhere on reasonable terms. 13 C.F.R. §

3   120.100(e); 13 C.F.R. § 120.101. Borrowers can only use loan proceeds for purposes specified in

4   SBA regulations. 13 C.F.R. §§ 120.120-120.130. The maximum available standard 7(a) loan is $5

5   million, and the SBA's current guaranty rates for standard 7(a) loans are 85% for loans of

6   $150,000 or less and 75% for loans greater than $150,000 (up to a maximum guaranty of $3.75

7   million, or 75% of $5 million). U.S. Small Bus. Admin., *Types of 7(a) loans* <available at

8   https://www.sba.gov/partners/lenders/7a-loan-program/types-7a-loans>; *see also COVID-19*

9   *Relief Assistance to Small Businesses: Issues and Policy Options*, 17. 7(a) loans generally must

10  have "the shortest appropriate term," with a maximum, subject to exceptions, of 10 years. 13

11  C.F.R. § 120.212. Lenders must charge no more than "a reasonable fixed interest rate" set by the

12  SBA, 13 C.F.R. § 120.213, or a variable interest rate that the SBA has approved, 13 C.F.R. §

13  120.214. *See also* U.S. Small Bus. Admin., *Maximum Allowable 7(a) Fixed Interest Rates*, 83

14  F.R. 55478 (Nov. 6, 2018) (explaining formula for determining maximum 7(a) interest rates).

### 3. The SBA Has Long Collected *and Published* Detailed Particularized Loan-Level Information (The Kind It's Now Trying to Hide) about Loans Made under Its Small Business Loan Guaranty Programs.

17       The SBA makes detailed loan-level information about traditional 7(a) loans that it has

18  approved *since 1991*, and information about 504/CDC loans, another type of small business

19  advancement loan administered by the SBA, publicly available on its website, in easily-

20  searchable Excel format. *See* the Declaration of Karl Olson in Support of Plaintiff's Motion for

21  Summary Judgment ("Olson Decl.") ¶ 7; *see also id.*, Ex. E (a "Data Dictionary" setting forth a

22  description of each category of information that the SBA publishes about 7(a) and 504/CDC

23  loans), Ex. F (sample excerpt of spreadsheet of information about 7(a) loans published on the

24  SBA website), Ex. G (sample excerpt of spreadsheet of information about 504/CDC loans

25  published on the SBA website). This loan-level information includes, among other things, the

26  name and address of each borrower; the name and address of each borrower's lender; the amount

27  of each approved loan; the amount of each approved loan guaranteed by the SBA; the approval

28

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

5

PLAINTIFF AMERICAN SMALL BUSINESS LEAGUE'S NOTICE OF MOTION & MOTION FOR SUMMARY
JUDGMENT; MEMORANDUM OF POINTS & AUTHORITIES; CASE NO. 3:20-CV-04619-MMC

date of each approved loan; the first disbursement date of each approved loan; the delivery method for each approved loan; the initial interest rate for each approved loan; the term of each approved loan; a brief description of the nature of each approved borrower's services; franchise names (where applicable); the location of the project each approved loan is meant to fund; the SBA district office that handled each approved loan; whether each borrower is an individual, corporation, or partnership; whether and when each approved loan was repaid; each loan's charge-off amount and date (if applicable); whether each loan was cancelled; and the number of jobs supported by each loan. *Id.* As of June 24, 2020, this information referred to loans issued through March 31, 2020. Olson Decl. ¶ 7.

There is no doubt that the SBA has this same information about PPP loans. It would be impossible to administer the PPP without collecting this information. Furthermore, the SBA is required to maintain substantial information about all loans governed by 15 U.S.C. section 636(a), which includes PPP loans, in a database "capable of providing timely and accurate information in order to identify loan underwriting, collections, recovery, and liquidation problems." 15 U.S.C. § 633(b)(3)(A). This includes "the identity of the borrower," and "the total dollar amount of the loan or debenture." *See* 15 U.S.C. § 633(b)(3)(B) (setting forth all categories of information the SBA is required to store in the database). The SBA is also required to provide an annual report to the President, the President of the Senate, the Senate Select Committee on Small Business, and the Speaker of the House of Representatives that includes "the names of the business concerns . . . for whom financing is arranged by the Administration, together with the amounts involved." 15 U.S.C. § 639(a).

C.     THE CORONAVIRUS AID, RELIEF, AND ECONOMIC SECURITY ("CARES") ACT

"The COVID-19 pandemic is, without dispute, the worst public health crisis the country has experienced since 1918." *Tradeways, Ltd. v. United States Dep't of the Treasury*, No. CV ELH-20-1324, 2020 WL 3447767, at *2 (D. Md. June 24, 2020). It "has shaken this nation to its core," and it "has taken the lives of thousands of Americans and permanently altered the lives of many more." *Am. Ass'n of Political Consultants v. U.S. Small Bus. Admin.*, ___ F. Supp. 3d ___ Case No. CV 20-970, 2020 WL 1935525, at *1 (D.D.C. Apr. 21, 2020). Also, it "has

6

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

1  unquestionably had – and continues to have – a devastating impact on our nation's economy." *Id.*;

2  *see also DV Diamond Club of Flint, LLC v. U.S. Small Bus. Admin.*, __ F. Supp. 3d __, Case No.

3  20-CV-10899, 2020 WL 2315880, at *1 (E.D. Mich. May 11, 2020) (stating that COVID-19

4  "destroyed the economy and threw tens of millions of Americans out of work").

5  COVID-19 "is a highly contagious and sometimes fatal respiratory illness." ." *Tradeways,*

6  *Ltd.*, 2020 WL 3447767, at *2. It "first appeared in Wuhan, China in December 2019; in a matter

7  of months, COVID-19 spread to every corner of the globe. [n.3] On March 12, 2020, the World

8  Health Organization declared COVID-19 a global pandemic." *Id.* (citing *WHO Director-*

9  *General's opening remarks at the mission briefing on COVID-19*, World Health Org. (March 12,

10  2020) <available at https://bit.ly/2XWdodD>). "The next day, President Trump declared a

11  national emergency." *Id.* (citing The White House, *Proclamation on Declaring a National*

12  *Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020)

13  <available at https://bit.ly/3flFu8i>).

14  Because there is no cure for COVID-19, "the Center for Disease Control and Prevention

15  has implored citizens to practice 'social distancing' in order to abate the spread of the virus." *Id.*

16  (citing *Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, Ctrs. for

17  Disease Control & Prevention <available at https://bit.ly/3dPA8Ba>). "To that end, nearly every

18  state issued mandatory stay-at-home orders, directing residents to remain at home except to

19  conduct essential activities." *Id.* (citing *Sarah Mervosh et al.*, *See Which States Are Reopening*

20  *and Which Are Still Shut Down*, N.Y. Times (May 15, 2020) <available

21  at https://nyti.ms/2Z6Fm7F>). "As a result, life as we know it came to a halt; schools, restaurants,

22  bars, movie theaters, shopping malls, retail stores, houses of worship, and gyms all shuttered for a

23  significant period of time." *Id.*

24  While social distancing measures were "needed to flatten the epidemiological curve," they

25  – and COVID-19 itself – have "had tremendous economic consequences." *Id.* As one court

26  emphasized in late June,

27  Personal consumption in March 2020 plunged by a record 7.5 percent. *See*
   *Personal Income and Outlays: March 2020*, U.S. Bureau of Econ. Analysis (Apr.

28

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

7

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

30, 2020 8:30), https://bit.ly/3d8wUZ2. In the month of April 2020 alone, more than 20 million Americans lost their jobs, driving the unemployment rate to 14.7 percent, the largest single-month increase ever recorded. *See Economic News Release*, U.S. Bureau of Lab. Stat. (May 8, 2020), https://bit.ly/2UGiOYr. Notably, these losses reached people from all stations of life: the leisure and hospitality industry lost 7.7 million jobs (nearly half the industry), while the education and health services industry, the professional and business services industry, and the retail trade industry each shed more than 2 million jobs. *Id.*

*Id.*

The economic damage has continued to mount. An "advance" estimate released by the Bureau of Economic Analysis of the United States Department of Commerce estimated that in the second quarter of 2020, our current-dollar gross domestic product decreased by a staggering 34.3%, or $2.15 trillion (by contrast, in the first quarter of 2020, current-dollar gross domestic product decreased by 3.4%, or $186.3 billion). *See* U.S. Dept. of Commerce, *Gross Domestic Product, Second Quarter 2020 (Advance Estimate) and Annual Update* (July 30, 2020) <available at https://www.bea.gov/sites/default/files/2020-07/gdp2q20_adv.pdf>. The *New York Times* elaborated:

> The economic collapse in the second quarter was unrivaled in its speed and breathtaking in its severity. The decline was more than twice as large as in the Great Recession a decade ago, but occurred in a fraction of the time. The only possible comparisons in modern American history came during the Great Depression and the demobilization after World War II, both of which predated modern economic statistics.

Casselman, *A Collapse That Wiped Out 5 Years of Growth, With No Bounce in Sight* (N.Y. Times July 30, 2020) <available at https://www.nytimes.com/2020/07/30/business/economy/q2-gdp-coronavirus-economy.html>.

In response to COVID-19's economic impact, Congress passed and the President signed into law "an unprecedented effort to undo that financial ruin," *DV Diamond Club of Flint, LLC*, 2020 WL 2315880, at *14: the CARES Act, Pub. L. 116-136 (March 27, 2020). The Congressional Budget Office estimated that the CARES Act would cost taxpayers $1.7 trillion. Swagel, *Re: Preliminary Estimate of the Effects of H.R. 748, the CARES Act, Public Law 116-136, Revised, With Corrections to the Revenue Effect of the Employee Retention Credit and to the*

8

*Modification of a Limitation on Losses for Taxpayers Other Than Corporations* (Congressional Budget Office Apr. 27, 2020) <available at https://www.cbo.gov/system/files/2020-04/hr748.pdf>. President Trump stated in remarks accompanying the CARES Act's enactment that it would cost three times that amount. *See* Pres. Trump, *Remarks by President Trump at Signing of H.R. 748, The CARES Act* (Mar. 27, 2020) <available at https://www.whitehouse.gov/briefings-statements/remarks-president-trump-signing-h-r-748-cares-act/> ("I'll sign the single-biggest economic relief package in American history . . . .  It's twice as large as any relief ever signed. . . .  So you're talking about 6.2 trillion-dollar bill."). Either way, the CARES Act was the most expensive economic recovery investment in United States history.[2]

The PPP is one of the largest and most important programs created and funded by the CARES Act. Pub. L. 116–136, Title I, §§ 1102, 1106 (March 27, 2020). The government has repeatedly asserted that the PPP was intended to protect small businesses.  *See* U.S. Department of the Treasury, *The CARES Act Provides Assistance to Small Businesses*, available at https://home.treasury.gov/policy-issues/cares/assistance-for-small-businesses (last visited Aug. 23, 2020); *see also* U.S. Small Bus. Admin., *Paycheck Protection Program*, <available at https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program > (touting PPP loans as "designed to provide a direct incentive for small businesses to keep their workers on the payroll."); *Remarks by President Trump at Signing of H.R. 748, The CARES Act* (describing CARES Act programs focused on helping small businesses). To fund the PPP alone, Congress initially allotted $349 billion. Pub. L. 116–136, Title I, § 1102(b). It later added much more; the amount allotted for PPP loans eventually rose to $659 billion. *See infra.*

The PPP is an expansion of the SBA's traditional 7(a) small business loan guaranty program, and, unless otherwise stated, is subject to the 7(a) program's statutory rules. To create the PPP, the CARES Act added a new paragraph to section 7(a) of the Small Business Act, 15 U.S.C. § 636(a)(36), that provides, "except as otherwise provided in this paragraph, the [SBA]

---

[2] The government has since doubled down on that investment, enacting additional legislation that has continued and increased funding for CARES Act programs. *See infra*.

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

1   may guarantee [PPP] covered loans under the same terms, conditions, and processes as a loan

2   made under [section 7(a), 15 U.S.C. § 636(a)]." 15 U.S.C. § 636(a)(36)(B). The CARES Act then

3   explained how PPP loans differ from traditional 7(a) loans. *Id.* Section 636(a)(36)(D)-(R). Unlike

4   traditional 7(a) loans, which are available to only small business concerns as defined by 15 U.S.C.

5   section 632 and 13 C.F.R. section 121.201, the PPP "relaxes size limitations to allow businesses

6   with as many as 500 employees – or even more, depending on their industry – to receive loans."

7   *Am. Ass'n of Political Consultants*, 2020 WL 1935525, at *1 (citing 15 U.S.C. §

8   636(a)(36)(D)(i)(I), (II)). It also authorizes the SBA to make covered loans to "some non-profit

9   organizations, veterans organizations, independent contractors, and self-employed individuals, as

10  well as to small business and Tribal concerns," *id.* (citing 15 U.S.C. § 636(a)(36)(D)(i), (ii)),

11  which would not be permitted to take out traditional 7(a) loans. It directs the SBA to guarantee

12  PPP loans in their entirety, rather than in part, with a maximum term of 10 years, and a maximum

13  interest rate of 4% (subsequently capped by the SBA even further, "to only one percent"). *Id.* It

14  "also waives the no credit elsewhere, personal guarantee, collateral, and guaranteed loan fee

15  requirements normally imposed on businesses seeking an SBA loan." *Id.* (citing 15 U.S.C. §

16  636(a)(36)(H)-(J)).

17      The maximum amount of a PPP loan – and PPP loan amounts can be lower; there is no

18  requirement that borrowers request or obtain the maximum – is the lesser of $10 million or two

19  and a half times the borrower's average total monthly "payroll costs." 15 U.S.C. § 636(a)(36)(E).

20  "Payroll costs" is a term of art in the PPP, with a statutory definition that takes up the better part

21  of a page, and a meaning that differs significantly from its usual one. *See* 15 U.S.C. §

22  636(a)(36)(A)(viii). For purposes of determining a borrower's maximum PPP loan, compensation

23  paid to an employee in excess of an annual salary of $100,000, 15 U.S.C. §

24  636(a)(36)(A)(viii)(II)(aa), and payments to an independent contractor or sole proprietor in

25  excess of $100,000 per year, 15 U.S.C. § 636(a)(36)(A)(viii)(I)(bb), are excluded from the

26  "payroll costs" calculation.

27      The CARES Act also provides that PPP loans can, and often will, be "forgiven up to the

28  full principal amount borrowed." *Am. Ass'n of Political Consultants*, 2020 WL 1935525, at *2

10

(citing Pub. L. 116–136, Title I, § 1106(b); PPP Interim Final Rule at 1, 13).

> The amount forgiven depends on the borrower's payroll costs and payments for rent, utilities, and mortgage interest. [Pub. L. 116–136, Title I,] § 1106(b)(1)-(4), (d); PPP Interim Final Rule at 14. The Act requires the SBA to remit to the lender the amount forgiven plus interest. [Pub. L. 116–136, Title I,] § 1106(c)(3).

*Id.*

The SBA launched the PPP on April 3, 2020, and *only two weeks later*, it reported that it "ha[d] processed more than 14 years' worth of loans in less than 14 days." Mnuchin & Carranza, *Statement from Secretary Steven T. Mnuchin and Administrator Jovita Carranza on the Success of the Paycheck Protection Program*, U.S. Dep't of Treasury (Apr. 17, 2020) <available at https://home.treasury.gov/news/press-releases/sm983>. As of April 17, 2020, "[t]he vast majority of these loans – 74% of them – were for under $150,000." *Id.* The SBA exhausted its first round of PPP funding on these early loans. *See* Frankel, *The Paycheck Protection Program Ran Out of Funding. What's Next for Small Business Owners?* (Forbes Apr. 16, 2020) <available at https://www.forbes.com/sites/advisor/2020/04/16/the-paycheck-protection-program-ran-out-of-funding-whats-next-for-small-business-owners/#3e3a17274405>. But Congress quickly provided $321 billion more, Paycheck Protection Program and Health Care Enhancement Act, P.L. 116-139; extended the loan forgiveness covered period, Paycheck Protection Program Flexibility Act, P.L. 116-142; and extended authority for commitments for the PPP and the covered loan period and authorized up to $659 billion for PPP loans and $30 billion for traditional 7(a) small business loans, P.L. 116-139.

P.L. 116-139 provided that the SBA was to stop accepting PPP loan applications on August 8, 2020. As of that date, the SBA reported that it had approved 5,212,128 PPP loans (after cancellations), for a total of $525,012,201,124. U.S. Small Bus. Admin., *Additional Program Information: approvals as of August 8, 2020* <available at https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program>.

The nation's elected representatives are now in the midst of a debate about whether and how the PPP should be extended or changed. Two competing bills, the Health and Economic Recovery Omnibus Emergency Solutions (HEROES) Act, H.R. 6800, and the Continuing Small

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

11

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

1  Business Recovery and Paycheck Protection Program Act, S. 4321, have been passed by the

2  House of Representatives and the Senate, respectively. Both would make changes to the PPP. *See*

3  *COVID-19 Relief Assistance to Small Businesses: Issues and Policy Options*, summary, 3-5

4  (stating that negotiation over these bills is underway). No resolution has yet been reached as of

5  this brief's filing.

6       Since the PPP began, the SBA has required prospective PPP borrowers to use SBA Form

7  2483 (the "PPP application form") to apply for a PPP loan. *Business Loan Program Temporary*

8  *Changes; Paycheck Protection Plan*, 85 F.R. 20,811 (Apr. 15, 2020). "The SBA published the

9  PPP Application Form along with the First Interim Rule" about the PPP. *Alaska Urological*

10 *Institute, P.C. v. U.S. Small Bus. Admin.*, Case No. 3:20-CV-00170, 2020 WL 4910291, at *3 (D.

11 Alaska Aug. 20, 2020). ***The PPP application form has always explicitly warned prospective***

12 ***borrowers that*** if they wanted a PPP loan, they had to agree that ***"the names of the borrowers"***

13 ***and "the amount of the loan" would "be automatically released" under FOIA***:

14      **Freedom of Information Act (5 U.S.C. 552)** – Subject to certain exceptions,
        SBA must supply information reflected in agency files and records to a person
15      requesting it. **Information about approved loans that will be automatically
        released includes**, among other things, statistics on our loan programs (individual
16      borrowers are not identified in the statistics) and other information such as the
        **names of the borrowers** (and their officers, directors, stockholders or partners),
17      the collateral pledged to secure the loan, **the amount of the loan**, its purpose in
        general terms and the maturity. Proprietary data on a borrower would not
18      routinely be made available to third parties. All requests under this Act are to be
        addressed to the nearest SBA office and be identified as a Freedom of Information
19      request.

20 Olson Decl., Ex. H (emphasis added). This warning was consistent with the SBA's long history of

21 disclosing detailed, loan-level information about other 7(a) borrowers and loans, and with the

22 CARES Act's affirmation that "except as otherwise provided in [section 7(a), 15 U.S.C. §

23 636(a)], the [SBA] may guarantee [PPP] covered loans ***under the same terms, conditions, and***

24 ***processes as a loan made under this subsection***." 15 U.S.C. § 636(a)(36)(B) (emphasis added).

25      **C.     THE PPP'S PARTICULAR PROGRAMMATIC PROBLEMS**

26      Soon after the PPP began, stories emerged about problems implementing the huge

27 program, including claims of inconsistent treatment of prospective borrowers and challenges and

28

12

confusion regarding the application process. *See, e.g.*, Kurtzleben, et al., *Here's How the Small Business Loan Program Went Wrong in Just 4 Weeks* (NPR May 4, 2020) <available at https://www.npr.org/2020/05/04/848389343/how-did-the-small-business-loan-program-have-so-many-problems-in-just-4-weeks>. It also came to light that large businesses had received PPP loans, including national restaurant chains like Shake Shack and Ruth's Chris Steak House and the Los Angeles Lakers. *Id.* Some large businesses cancelled and repaid their PPP loans under public pressure, and elected officials called for the disclosure of information about PPP borrowers to allow for better oversight. Olson Decl. ¶¶ 9-10; *see also* Gregg, et al., *In big reversal, Treasury and SBA agree to disclose details about many small business loan recipients* (Washington Post June 19, 2020) <available at https://www.washingtonpost.com/business/2020/06/19/treasury-sba-ppp-disclosure/>.

At first, the SBA refused to release *any* information about PPP loans beyond high level statistics. But eventually, after receiving FOIA requests for PPP loan information from, among others, ASBL, on July 6, 2020, the SBA reversed course and published some, but not all, information about individual PPP loans. U.S. Dep't of Treasury, *SBA and Treasury Announce Release of Paycheck Protection Program Loan Data* (July 6, 2020) <available at https://home.treasury.gov/news/press-releases/sm1052>. The SBA continued to withhold the actual amounts that named borrowers had been loaned and the names of all borrowers who had received less than $150,000 (as the SBA has admitted, this means that a majority of PPP borrowers' identities have been, and are continuing to be, withheld). *Id.* For PPP loans of $150,000 or more, the SBA released "business names, addresses, NAICS codes, zip codes, business type, demographic data, non-profit information, name of lender, jobs supported, and loan amount ranges," stating whether each loan was for "$150,000-$350,000," "$350,000-$1 million," "$1-2 million," "$2-5 million," or "$5-10 million." *Id.* For PPP loans of less than $150,000, the SBA withhold the names and addresses of the borrowers. *Id.*

Thus, the SBA is concealing whether a borrower with a very large loan got $5,000,001 or $9,999,999. And it is not disclosing the names of a majority of borrowers.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The limited information that the SBA has disclosed about individual PPP loans – which falls far short of [3] what the SBA has disclosed about decades of other 7(a) loans and conceals information borrowers were explicitly told would be released "automatically" – is not enough to allow ASBL, small businesses, the public, or our representatives in Congress to assess how the PPP is working. Chapman Decl. ¶ 8. By extension, it is also not enough to allow an informed decision about whether the PPP should be extended again, or about whether and how the PPP should be amended to ensure that it helps *small* businesses, as our nation's leaders have promised. *Id*. The PPP's huge cost to the taxpayers, the fact that many **large** businesses got PPP loans, the economic devastation caused by COVID-19, the national debate about the PPP's future, and the election this November all underscore that much more information about PPP loans should be disclosed, **as soon as possible**. Chapman Decl. ¶ 11.

**E.     ASBL's FOIA Request No. SBA-2020-000566 and This Lawsuit**

On April 9, 2020, ASBL made a FOIA request to the SBA, Olson Decl., Ex. A, which it amended on April 16, 2020, to ask for:

- Records relating to any committee, advisory group or panel the SBA has established to administer the $350 billion CARES Act response to the coronavirus pandemic, especially the members of that committee and any regulations which they have drafted and correspondence among the members of that committee.

- A list of names and bios of members who serve on any of the active SBA advisory committees.

- **Data showing how the appropriated funds from the CARES Act were distributed through PPP program.**

- Any communication between the White House, SBA, and Congress regarding requests for additional funding for the CARES Act and PPP Program.

Olson Decl. ¶ 3 & Ex. A & B (emphasis added). This request sought information related to the CARES Act, the PPP, and small business advisory committees that might help guide the SBA's administration of the PPP. *Id.* The third part of the amended request, "[d]ata showing how the

---

[3] For example, the Kasowitz law firm, which has represented President Trump, and which grossed about $215 million last year, got a loan in the $5 to $10 million range. *See* the Declaration of Mark J. Olson in Support of Plaintiff's Motion for Summary Judgment ("Mark Olson Decl."), ¶ 2; Olson Decl. Ex. N. Many other large businesses also got loans in that range but saved no jobs. Mark Olson Decl., ¶ 2.

14

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

1   appropriated funds from the CARES Act were distributed through PPP program," is most

2   important for present purposes, because it covers the loan-level information about PPP loans that

3   ASBL is seeking in this motion. *See* Olson Decl., Ex. A & B.

4       On May 19, 2020, Oreoluwa Fashola of the SBA sent an e-mail correspondence to ASBL

5   about the request. Olson Decl. ¶ 4 & Ex. C. In the e-mail, Mr. Fashola stated that the SBA had no

6   records responsive to category one, and that the SBA would respond regarding the remainder of

7   the FOIA request separately. Olson Decl. ¶ 4 & Ex. C. Mr. Fashola stated that the SBA would

8   continue searching for records responsive to categories two, three, and four. Olson Decl., Ex. C.

9       As to category three, the SBA also provided a link to its website. Olson Decl. ¶ 4 & Ex. C.

10  The link led to a PDF document that stated, in extremely broad terms, the total number and

11  amount of PPP loans that had been approved nationally, in each state, and in each industry. *See*

12  Olson Decl. ¶ 4 & Ex. C.

13      On May 22, 2020, ASBL sent a further letter to the SBA in response to the SBA's May

14  19, 2020 e-mail. Olson Decl., Ex. D. ASBL explained that the SBA's May 19, 2020 letter was not

15  a lawful determination. Olson Decl., Ex. D. ASBL demanded that the SBA provide a lawful

16  determination that referred to each category of requested records, and that SBA disclose, at the

17  very least, the names of all PPP loan recipients, and the amounts of all PPP loans – which the

18  SBA discloses about other 7(a) loans, and which ASBL is seeking, among other information, in

19  this motion – by May 29, 2020. Olson Decl., Ex. D.

20      From that point forward, the SBA's approach has been to ignore ASBL's FOIA request.

21  Olson Decl. ¶ 6. Neither the SBA nor any other federal official or representative has responded

22  further. Olson Decl. ¶ 6. The SBA has not produced any records in response to ASBL's FOIA

23  request, except for the summary document to which it provided a hyperlink in its May 19, 2020

24  letter. Olson Decl. ¶ 6. The SBA has not informed ASBL of whether or the extent to which it

25  intends to disclose records in response to ASBL's FOIA request. Olson Decl. ¶ 6. And the SBA

26  has not told ASBL whether or the extent to which it intends to withhold records or information

27  based on FOIA exemptions, or, if so, what exemptions it believes apply. Olson Decl. ¶ 6; *see also*

28  Dkt. No. 14 (defendant SBA's answer, which does not refer to any FOIA exemptions).

The SBA has, however, in a FOIA case in Washington, D.C. in which the plaintiffs are seeking, among other things, information that includes PPP information that ASBL is seeking in this motion (and in which the SBA is represented by James Bickford, the same lawyer who represents the SBA here), the SBA has moved for summary judgment as to PPP information that ASBL is seeking in this motion based on FOIA Exemptions 4 and 6. Olson Decl., Ex. P (*WP Company LLC*, Case No. 1:20-CV-01240 (JEB), ECF No. 14). The SBA's position is that Exemption 4 supports all of its withholdings, and that Exemption 6 supports withholding identifying information about borrowers who took out PPP loans of less than $150,000. *Id.* The SBA has, therefore, made clear that it will not voluntarily release the PPP information sought in this motion based on FOIA Exemptions 4 and 6.

## III.   ARGUMENT

### A.   BURDEN ON GOVERNMENT TO JUSTIFY NON-DISCLOSURE

We begin with FOIA's bedrock principles. As the Ninth Circuit recently explained,

FOIA was enacted "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (internal quotation marks and citation omitted). The Act "is premised on the theory that in order for democracy to function properly, citizens must have access to government information, particularly where access might be 'needed to check against corruption and to hold the governors accountable to the governed.' " *Pac. Fisheries Inc. v. United States*, 539 F.3d 1143, 1147 (9th Cir. 2008) (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152, 110 (1989). To that end, FOIA "attempts to create a judicially enforceable public right to secure [official] information from possibly unwilling official hands." *Rose*, 425 U.S. at 361 (quoting *EPA v. Mink*, 410 U.S. 73, 80 (1973). Implementing that right, FOIA mandates that government agencies make their internal records available to the public, subject to nine enumerated exemptions. *See* 5 U.S.C. § 552(a)-(b).

*A.C.L.U. v. U.S. Dep't of Justice*, 880 F.3d 473, 482-83 (9th Cir. 2018).

While FOIA contains exemptions, they

. . . do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.' Consistent with this objective, *the only exemptions are the ones listed in the statute, and they are to be narrowly construed.* Moreover, *the government has the burden* of justifying withholding under any of FOIA's exemptions.

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

1    *Id.* at 483 (internal citations omitted, emphasis added).

2           In addition, pursuant to the FOIA Improvement Act of 2016, "An agency shall . . .

3    withhold information under this section only if [ ] (I) the agency reasonably foresees that

4    disclosure would harm an interest protected by [a FOIA] exemption described in [5 U.S.C. §

5    552(b)]; or (II) disclosure is prohibited by law[.]" 5 U.S.C. § 552(a)(8)(A). This means that for

6    discretionary exemptions, "an agency must release a record – even if it falls within a FOIA

7    exemption – if releasing the record would not reasonably harm an exemption-protected

8    interest." *Rosenberg*, 2018 WL 4637363, at *2; *Ecological Rights Found. v. F.E.M.A.*, Case No.

9    16-cv-05254-MEJ, 2017 WL 5972702, at *7 (N.D. Cal. Nov. 30, 2017) (holding that the

10   Government had failed to justify Exemption 5 withholdings because it had "fail[ed] to explain

11   how disclosure would expose [the Government's] decision-making process so as to discourage

12   candid discussion" and "d[id] not provide any justification for how the agency would be

13   harmed by disclosure as required by the FOIA Improvement Act of 2016[,] 5 U.S.C. §

14   552(a)(8)(A)(i)").

15          "Most FOIA cases are resolved by the district court on summary judgment, with the

16   district court entering judgment as a matter of law." *Animal Legal Defense Fund v. U.S. Food &*

17   *Drug Admin.*, 836 F.3d 987, 989 (9th Cir. 2016) (en banc). However, "there is no principled

18   distinction to be drawn between the usual summary judgment standard and the standard to be

19   applied in FOIA cases." *Id.* As always, the Court should grant summary judgment if "the

20   movant shows that there is no genuine issue as to any material fact and the movant is entitled to

21   judgment as a matter of law." Fed. R. Civ. P. 56(a).

22          **B.      DEFENDANT HAS CONSTRUCTIVELY DENIED FOIA REQUEST NO. SBA-2020-**
23                    **000566, AS AMENDED, INCLUDING THE PORTION OF THAT REQUEST THAT SEEKS**
                      **THE PPP INFORMATION SOUGHT IN THIS MOTION.**

24   FOIA provides that an agency must, at least as a general matter:

25   . . . determine within 20 days (excepting Saturdays, Sundays, and legal public
26   holidays) after the receipt of any such request whether to comply with such
     request and shall immediately notify the person making such request of such
27   determination and the reasons therefor, and of the right of such person to appeal
     to the head of the agency any adverse determination.
28

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

5 U.S.C. § 552(a)(6)(A)(i). As the D.C. Circuit has held,

> . . . in order to make a "determination" and thereby trigger the administrative exhaustion requirement, the agency must at least: (i) gather and review the documents; (ii) determine and communicate the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents; and (iii) inform the requester that it can appeal whatever portion of the "determination" is adverse.

*Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n* ("*CREW*"), 711 F.3d 180, 188 (D.C. Cir. 2013). Put another way, an agency must complete a lawful search for responsive records, evaluate what exemptions, if any, it wants to invoke, and advise the requester as to what exemptions it is invoking and the scope of its withholdings within the 20-working-day timeline.

Here, the SBA failed to make a timely determination on ASBL's FOIA request, as amended, with respect to the PPP information sought here. Its statement that it would say more about that part of ASBL's request later, followed by months of stonewalling, doesn't satisfy FOIA or *CREW*. *See* Olson Decl., Ex. C & D. As a result, ASBL is free to seek and obtain an order directing the SBA to disclose the PPP information that it is unlawfully withholding.

### C. DEFENDANT HAS IMPROPERLY DENIED FOIA REQUEST NO. SBA-2020-000566, AS AMENDED.

#### 1. Defendant Is Withholding Responsive Records.

Without question, the SBA has the same kinds of information about each and every PPP loan that it discloses about other 7(a) loans. The SBA must collect this information in order to administer the PPP. Its extensive, individualized, loan-level disclosures about other 7(a) loans on its website verify as much. The SBA is required to collect at least most of this information to populate its required risk management database, 15 U.S.C. § 633(b)(3)(B), and to make required reports to the President and Congress, 15 U.S.C. § 639(a). Moreover, the SBA has declared in *WP Company*, ECF No. 14-1 at 20 ¶ 90, that it possesses, but is withholding, responsive PPP borrower data under FOIA Exemptions 4 and 6, including "the names and addresses of all borrowers of PPP loans made below $150,000" and "the precise values of all PPP loans worth

18

"$150,000 or more."

### 2.  Defendant Cannot Justify Failing to Disclose the Same Information about PPP 7(a) Loans that It Has Always Disclosed About Non-PPP 7(a) Loans, and that It Specifically Told Borrowers It Would Disclose "Automatically."

The SBA bears the burden of justifying non-disclosure. The SBA has not yet identified any exemptions to ASBL, let alone substantiated any exemption claims. Indeed, the SBA's Answer does not even mention any exemptions, despite the fact that they are affirmative defenses on which the SBA bears the burden of proof. *See* ECF No. 14. Having invoked and substantiated no exemption claims, the SBA cannot justify non-disclosure, and the records at issue should be disclosed. That stated, because the SBA has invoked Exemptions 4 and 6 to justify non-disclosure of the information sought here in *WP Company*, we preliminarily address both exemptions below.

#### i.  Exemption 4 Does Not Apply.

To qualify for Exemption 4 protection, information must be "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential." *Goldwater Institute v. U.S. Dep't of Health and Human Services*, No. 19-15615, 2020 WL 1487844, at *1, __ Fed. App'x __ (9th Cir. March 24, 2020); *accord Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2365, 2362 (2019); 5 U.S.C. § 552(b)(4). The PPP information at issue here fails at least the second and third of these requirements.

First, even if the loan-level information about PPP loans sought in this motion was "submitted by a person" for purposes of Exemption 4 (and it was not), it does not qualify as "confidential." In *Food Marketing Institute*, the Supreme Court held that to be "confidential" under Exemption 4, looking to "the ordinary meaning and structure of the law itself," information must be "both customarily and actually treated as private by its owner." 139 S. Ct. at 2364, 2366; *see also id.* at 2363 ("In one sense, information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it. *See, e.g.*, Webster's Third New International Dictionary 476 (1961) ("known only to a limited few" or "not publicly disseminated"); Black's Law Dictionary 370 (rev. 4th ed. 1968) ("intended to be held in confidence or kept secret").") Here, PPP borrowers did not treat the information they

19

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

submitted to apply for PPP loans as private under this standard. **They disclosed the information in an application form that explicitly stated the information would be made public "automatically."** And, they provided the information even though the SBA publishes detailed, loan-level information about decades worth of other 7(a) loans online. PPP borrowers struck a deal with taxpayers when they applied for their PPP loans: In exchange for public oversight of some basic information about their companies and their loans, they received thousands, tens of thousands, hundreds of thousands, or even millions of dollars in aid, in most cases without having to pay back much or any of it. They cannot be said to have kept information submitted as part of such a bargain private. *Cf. Buffalo Evening News, Inc. v. U.S. Small Bus. Admin.*, 666 F. Supp. 467, 470-17 (W.D.N.Y. 1987) (agreeing with plaintiff that ordering disclosure of information about SBA emergency disaster loans would not dissuade borrowers from submitting information, because it was "likely that borrowers will see such disclosure as a 'cost of doing business' with the government").

*Food Marketing Institute* adds that information may also need to be submitted under a government assurance of privacy to be "confidential" under Exemption 4. 139 S. Ct. at 2363; *see also id.* ("In another sense, information might be considered confidential only if the party receiving it provides some assurance that it will remain secret."). The Court need not reach this issue; PPP borrowers' decision to submit PPP loan applications under the circumstances here, and the fact that the information at issue is not "obtained from a person" for purposes of Exemption 4, is enough to defeat any Exemption 4 claim. However, if the Court does reach the issue, it should hold that an assurance of privacy is required, and that the SBA's assurances **of publicity** (not privacy) here further undermine its Exemption 4 claim. Indeed, the SBA's position with respect to PPP information illustrates that an assurance of privacy requirement is necessary to harmonize the Exemption 4 standard with the ordinary meaning of "confidential." Here, the SBA gave PPP applicants an assurance of ***publicity*, not privacy**. Yet, amazingly, the SBA is withholding PPP loan information based on Exemption 4 anyway. That contradicts the ordinary meaning of the word "confidential." A government assurance requirement would ensure that representations to submitters are factored into the Exemption 4 analysis consistently moving forward, as Exemption

20

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

1   4's language requires.

2       The SBA may argue, as it has in *WP Company*, ECF No. 14 at 9-18, that disclosing

3   loan-level information about PPP loans would reveal PPP borrowers' payroll information, and,

4   as a result, that it cannot disclose loan-level PPP information under Exemption 4. Not so. First,

5   if a business discloses any information, payroll included, to the government *after the*

6   *government explicitly tells the business that it intends to make that information public*, or under

7   circumstances in which a reasonable person would expect that information to become public,

8   the information cannot be said to be "confidential" in any sense, including under Exemption 4.

9   PPP borrowers submitted their applications under both of these circumstances, defeating

10  Exemption 4.[4] Second, PPP loan information would not reveal any actual payroll information.

11  True, the maximum possible PPP loan is calculated based in part on the borrower's average

12  "payroll costs," as defined by the PPP. But there is no requirement that businesses take out the

13  maximum possible PPP loan, and "payroll costs" in the PPP has a specialized, unusual meaning

14  (for example, they are capped at $100,000 per employee). As a result, a PPP borrower's actual

15  payroll information cannot be calculated, or even reliably estimated, based on the amount of a

16  PPP loan. That rules out any attempt to apply Exemption 4 on this basis. *See Pac. Architects*

17  *and Engineers v. U.S. Dep't of State*, 906 F.2d 1345, 1347-48 (9th Cir. 1990) (rejecting

18  argument that "unit price rates" in contract could not be disclosed based on the possibility that

19  third parties could deduce contractor's profit margin where "unit price rates" were actually

20  "made up of a number of fluctuating variables" that would prevent such a determination).

21      Second, the PPP loan information at issue here is government information about the

22  executive actions of approving and forgiving PPP loans, not information "obtained from a

23  person" within the meaning of Exemption 4. While PPP borrowers generally requested PPP loans

24  
_____

25  [4] Contrast the main case the SBA has cited on payroll information in *WP Company*, ECF No. 14
    at 12-3, *Flightsafety Services Corp. v. U.S. Dep't of Labor*, which emphasized that the

26  information there had been submitted under a "pledge of confidentiality," on forms that
    "contain[ed] pledges to the non-government establishments providing information to the BLS that

27  such information will be used only for statistical purposes and will be held in confidence and will
    not be disclosed without their written consent, to the full extent permitted by law." 326 F.3d 607,

28  612 (5th Cir. 2003).

in certain amounts and provided certain information in doing so, information generated **by the SBA** about PPP loans when approving them – including the name of each PPP borrower, the amount of each PPP loan, when and the extent to which each PPP loan has been repaid or forgiven, and all of the other information at issue in this motion – records executive action, and is not subject to Exemption 4. *See Bloomberg L.P. v. Bd. of Governors of the Federal Reserve System*, 601 F.3d 143, 145-49 (2d Cir. 2010) (holding that a FOIA request for information about emergency bank loans "loan by loan, for the name of the borrowing bank, the amount of the loan, the origination and maturity dates, and the collateral given" did not seek information that had been "submitted by a person" within the meaning of Exemption 4, because "the only information sought [was] a summary report of actions that were taken by the government"); *Buffalo Evening News, Inc.*, 666 F. Supp. at 468-69 (holding that, as here, information about emergency disaster loans and other loans approved by the SBA was not "obtained from a person" within the meaning of Exemption 4, but rather "generated by the defendant SBA in the course of its involvement with its borrowers"). This requires that all of the information at issue be disclosed; and, at an absolute minimum, it means that the name of each PPP borrower and the amount of each PPP loan should be made public. *Id.*

Finally, to justify withholding information about broad swathes of PPP loans, as the SBA has done here, the SBA would need to establish that the *Food Marketing Institute* standard has been met with respect to each borrower, and not rely on broad assertions about "how the industry as a whole treats the information." *Center for Investigative Reporting v. U.S. Customs & Border Prot'n*, 436 F. Supp. 3d 90, 110-12 (D.D.C. 2019); *see also* 5 U.S.C. § 552(a)(8)(A) (FOIA Improvement Act of 2016 provision independently requiring a particularized showing to justify non-disclosure). Because the SBA cannot meet this standard, this motion should be granted.

### ii.      Exemption 6 Does Not Apply.

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). To determine if Exemption 6 applies, the Court should first determine if the records constitute "personnel, medical, or similar files," which, according to the D.C. Circuit, hinges on

22

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

whether disclosure would "jeopardize[] a personal privacy interest that Exemption 6 protects."

*Multi AG Media v. Dep't of Agriculture*, 515 F.3d 1224, 1228 (D.C. Cir. 2008). If so, the Court

should then turn to whether the privacy interest involved is "substantial," which means more than

*de minimis. Id.* at 1229-30. And if a substantial privacy interest exists, it must be balanced

against the interest in disclosure:

> First, in evaluating whether a request for information lies within the scope of a
> FOIA exemption, such as Exemption 6, that bars disclosure when it would
> amount to an invasion of privacy that is to some degree "unwarranted," "a court
> must balance the public interest in disclosure against the interest Congress
> intended the [e]xemption to protect."
>
> Second, the only relevant "public interest in disclosure" to be weighed in this
> balance is the extent to which disclosure would serve the "core purpose of the
> FOIA," which is "contribut[ing] significantly to public understanding of the
> operations or activities of the government."

*U.S. Dep't of Defense v. Federal Labor Relations Board*, 510 U.S. 487, 496 (1994) (citations

omitted). Furthermore, FOIA's "strong presumption in favor of disclosure," *U.S. Dep't of State v.

Ray*, 502 U.S. 164, 173 (1991), is "at its zenith" in the Exemption 6 analysis, *Jurewicz v. U.S.

Dep't of Agric.*, 741 F.3d 1326, 1332 (D.C. Cir. 2014) (quoting *Nat'l Ass'n of Home Builders v.

Norton*, 309 F.3d 26, 37 (D.C. Cir. 2002)). "[U]nless the invasion of privacy is 'clearly

unwarranted,' the public interest in disclosure must prevail." *Ray*, 502 U.S. at 177.

Moreover, the Court should not "limit [its] evaluation of the effects of disclosure to the

requesting party's particular purpose in seeking disclosure." *Painting Indus. of Hawaii Mkt.

Recovery Fund v. U.S. Dep't of Air Force*, 26 F.3d 1479, 1482 (9th Cir. 1994); *see also U.S. Dep't

of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 771 ("[W]hether an

invasion of privacy is *warranted* cannot turn on the purposes for which the request for

information is made."). The Court should "evaluate both the public benefit and the potential

invasion of privacy by looking at the nature of the information requested and the uses to which

it *could* be put if released to *any* member of the public." *Painting Indus. of Hawaii Mkt. Recovery

Fund*, 26 F.3d at 1482.

Here, many PPP borrowers are not protected by Exemption 6 at all, based on who owns

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

1   them. Exemption 6 does not "protect the privacy interests of businesses or corporations," but

2   instead protects records about "individually-owned businesses" and in records of "closely held"

3   businesses, where "the records would necessarily reveal at least a portion of the owner's

4   finances." *See id.* at 1228-29. As a result, with respect to all PPP borrowers that are not closely

5   held corporations or sole proprietorships, the SBA did not argue in the D.C. litigation that

6   disclosure would not be justified under Exemption 6. It should not, and presumably will not,

7   make such an argument here, either. Moreover, with respect to *all* PPP borrowers, the SBA has

8   disclosed the same information about very similar loans for decades, and the SBA explicitly

9   warned on the PPP application form that loan-level information would be disclosed automatically.

10  Under these circumstances, the borrowers have relinquished any claim to privacy that they might

11  otherwise have had.

12      Even if a subset of PPP borrowers had a more than *de minimus* privacy interest in the

13  information at issue in this motion (and they do not), that interest would be far outweighed by the

14  compelling public interest in disclosure. The CARES Act, the PPP, and their contemplated

15  revisions and extensions involve vast amounts of taxpayer funds and are intended to mitigate an

16  unprecedented economic disaster. There have been many instances of facially large businesses

17  (for example, the Kasowitz law firm and ShakeShack) obtaining PPP loans, and of some large

18  businesses obtaining PPP loans while still losing many jobs, *see* Mark Olson Decl. ¶ 2, which

19  suggests the expanded definition of small business in the PPP, or other PPP rules, may require

20  adjustment. Also, the *New York Times* recently reported that the government is investigating

21  criminal fraud by PPP loan recipients. Olson Decl., Ex. O. It is difficult to conceive of a FOIA

22  case involving a greater public interest in access than this one.

23      Disclosure of the records at issue in this motion would fit FOIA's purpose of opening up

24  federal agency programs to public scrutiny like a glove. *See Elec. Frontier Found. v. Office of the*

25  *Dir. of Nat. Intelligence*, 639 F.3d 876, 887 (9th Cir. 2010) (holding that " '[o]fficial information

26  that sheds light on an agency's performance of its statutory duties" merits disclosure' ")

27  (quoting *Reporters Comm.,* 489 U.S. at 773); *Federal Labor Relations Board*, 510 U.S. at 495

28  (stating that the relevant public interest under FOIA is "the extent to which disclosure [of

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

24

requested files] would serve the 'core purpose of the FOIA,' which is 'contribut[ing] significantly to public understanding of the operations or activities of the government ' ").

> [T]he public has a particular and significant interest in the information Multi Ag seeks. USDA uses this information in the administration of its subsidy and benefit programs, and there is a special need for public scrutiny of agency action that distributes extensive amounts of public funds in the form of subsidies and other financial benefits. Brock v. Pierce County, 476 U.S. 253, 262, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) ("[T]he protection of the public fisc is a matter that is of interest to every citizen."); News–Press v. U.S. Dep't of Homeland Sec., 489 F.3d 1173, 1192 (11th Cir.2007) ("easily" concluding that there is a substantial public interest under FOIA Exemption 6 in "learning whether FEMA is a good steward of (sometimes several billions of) taxpayer dollars in the wake of natural and other disasters"); United States v. Suarez, 880 F.2d 626, 630 (2d Cir.1989) ("[T]here is an obvious legitimate public interest in how taxpayers' money is being spent, particularly when the amount is large.").

*Multi Ag.*, 515 F.3d at 1232.

The SBA has not shown, and cannot show, that Exemption 6 justifies non-disclosure. Further undermining the SBA's Exemption 6 invocation, as with Exemption 4, any showing would have to be particularized to satisfy the FOIA Improvement Act of 2016. 5 U.S.C. § 552(a)(8)(A). This motion should be granted.

## IV.  CONCLUSION

The public has an overwhelming interest in knowing how $650 billion in government money was spent and whether the money helped save small, struggling Mom-and-Pop restaurants on Main Street or gave a windfall to large restaurant chains, NBA basketball teams and large law firms which represent the President (or, perhaps, both).[5]  For the foregoing reasons, ASBL's motion should be granted.

/ /

/ /

/ /

---

[5] The Kasowitz law firm in New York, which grossed $215 million in 2019 and which represents President Trump, got a PPP loan in the $5 to $10 million range. Some 35 businesses in California alone took out loans in the $5 to $10 million range and didn't report how many, if any, jobs they saved.  For example, Reputation.com in Redwood City got a PPP loan in the $5 to $10 million range and put a "0" where the form asks the number of jobs saved. Mark Olson Decl. ¶ 2.

25

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Dated: September 4, 2020

CANNATA, O'TOOLE, FICKES & OLSON LLP


By:    /s/ Karl Olson
       KARL OLSON

Karl Olson
Aaron R. Field
Irene Lee

Attorneys for Plaintiff,
AMERICAN SMALL BUSINESS LEAGUE

CANNATA, O'TOOLE, FICKES & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111

PLAINTIFF AMERICAN SMALL BUSINESS LEAGUE'S NOTICE OF MOTION & MOTION FOR SUMMARY
JUDGMENT; MEMORANDUM OF POINTS & AUTHORITIES; CASE NO. 3:20-CV-04619-MMC